IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-407

No. COA21-796

Filed 21 June 2022

Alamance County, No. 20 JA 88

IN RE: R.J.P.

Appeal by Respondent-Mother from orders entered 17 September 2021 by Judge Kathryn W. Overby in Alamance County District Court. Heard in the Court of Appeals 10 May 2022.

> *Jamie L. Hamlett, for Alamance County Department of Social Services, Petitioner-Appellee.*
>
> *Parker Poe Adams & Bernstein LLP, by Adam C. Setzer, for Guardian ad Litem.*
>
> *Anné C. Wright, for Mother-Appellant.*

WOOD, Judge.

¶ 1        Respondent-Mother ("Mother") appeals from the trial court's orders granting guardianship of her son Ryan[1] to his paternal great aunt and uncle, Maria and Jordan

---

[1] A pseudonym is used to protect the identity of the minor child. *See* N.C.R. App. P. 42(b).

Turner (the "Turners")[2], and granting visitation rights with Ryan to his maternal grandparents, Elly and Charles Palmer (the "Palmers")[3]. On appeal, Mother argues the trial court abused its discretion by 1) denying her visitation with Ryan, and 2) not granting co-guardianship of Ryan to the Turners and Palmers. After a careful review of the record and applicable law, we affirm in part the orders of the trial court and remand in part for an appropriate visitation plan.

## I.    Factual and Procedural Background

Mother and Father began a romantic relationship, and together, the couple had Ryan on July 22, 2014. In 2014, the Alamance County Department of Social Services ("DSS") received a report of a domestic violence incident between Mother and Father while Ryan was present. During the investigation, DSS became concerned Father was "aggressive in his behaviors towards . . . Mother[.]" DSS was also concerned both parties were engaging in substance abuse. Ultimately, DSS closed the case as Services Recommended when Mother voluntarily returned to a residential treatment program. DSS recommended Mother "complete the full treatment program; seek counseling for domestic violence; and have no further contact with Respondent Father."

---

[2] Pseudonyms are used to protect the identity of the minor child. *See* N.C.R. App. P. 42(b).

[3] Pseudonyms are used to protect the identity of the minor child. *See* N.C.R. App. P. 42(b).

¶ 3      Approximately three years later, DSS received another report concerning Ryan. The report alleged Ryan was injured during an automobile accident that occurred because Mother was driving while under the influence of cocaine, marijuana, amphetamines, opiates, and benzos. Mother drove off of a bridge, landing in the water below. Ryan and Mother were able to climb up to safety, but Ryan "suffered a skull fracture, hematoma to the forehead and abrasion to the left upper shoulder."

¶ 4      In response to this report, DSS found the family to be in need of services and transferred the case to In-Home Services in New Hanover County on August 11, 2017. On August 23, 2017, the New Hanover County Department of Social Services ("NHCDSS") received a report regarding Ryan. This report alleged Mother was driving under the influence with Ryan in the car and was giving Ryan Benadryl to make him sleep. A few days later, NHCDSS created an initial plan for Mother to receive Substance Abuse and Mental Health treatment and for Ryan to begin receiving therapy services.

¶ 5      On October 27, 2017, Father notified NHCDSS he was concerned about Mother's behaviors. When NHCDSS spoke with Mother, she admitted to have been using cocaine, heroin, and Percocet in Ryan's presence. Four days later, Mother and Father decided to place Ryan with the Palmers. On November 28, 2017, Mother also moved into the Palmer's home. NHCDSS verified the move the next day, and the In-Home Services case was then transferred back to Alamance County. On August 16,

2018, NHCDSS closed its In-Home Services case.

¶ 6        Eight days later, Alamance County DSS received another report concerning Ryan. This report alleged Mother was under the influence of methamphetamines and driving with Ryan in the vehicle. The report also alleged Mother had assaulted Elly Palmer while Ryan was present. As a result, a safety plan was developed and a 50-B domestic violence protective order was granted against Mother. Meanwhile, Ryan continued to live with the Palmers. After the 50-B protective order expired, Mother moved back in with Elly Palmer. Shortly thereafter, DSS closed the case with services recommended for mental health and substance abuse treatment.

¶ 7        On February 18, 2020, DSS received a new report regarding Ryan. This report alleged Mother was acting erratic, "off her rocker[,]" and was tearing up the house. Both Father and Ryan were present during this incident. Because of Mother's behavior, Father and Ryan were forced to vacate the house and "did not have a place to stay." The report further alleged DSS had concerns Ryan may have neurological problems but that Mother and Father continued to deny or minimize any potential mental health needs Ryan may have.

¶ 8        On April 20, 2020, DSS determined the family was in need of services and transferred the case to In-Home Services to address 1) Mother's and Father's mental health needs and substance abuse, 2) continuing relationship discord between the parties, and 3) Ryan's mental health needs. Sometime afterwards, Father moved to

Wilmington, North Carolina.

¶ 9        On May 5, 2020, the Alamance County Sheriff's Office received a call about a suspicious person walking in the road, staggering, and flashing a flash light outside of the power plant in Graham, North Carolina. Deputy Stone responded to the scene and observed Father staggering and holding a flashlight. Deputy Stone transported Father back to the couple's residence. On the way, Father told Deputy Stone there was a shotgun inside the residence and that Mother was a felon. Upon arrival, Deputy Stone received consent to search the residence and discovered on the floor of the residence an un-locked, loaded shotgun within Ryan's access. Corporal T. Ray and Detective Wood also responded to the residence. Mother was arrested subsequent to the search and charged with possession of a weapon by a felon and child abuse. DSS received a report of this incident the following day and promptly conducted a pre-petition child family team meeting. There, it was agreed Ryan would stay with the Turners. Due to incarceration and the short notice of the meeting, Mother was not present at the meeting.

¶ 10        On May 7, 2020, DSS filed a juvenile petition alleging Ryan to be a neglected juvenile. The trial court entered a nonsecure custody order the same day, placing Ryan with the Turners. The trial court held two additional hearings regarding nonsecure custody of Ryan that same month. Mother remained incarcerated at the time of each hearing. After these hearings, the trial court entered orders continuing

Ryan's placement with the Turners.  In each order, the trial court found "[t]hat it is not in the best interest of the juvenile to have visitation/contact with Respondent Mother due to her current incarceration."

On July 15, 2020, the trial court conducted an adjudication and disposition hearing.  Mother remained incarcerated as of the date of this hearing.  By order entered August 4, 2020, the trial court adjudicated Ryan a neglected juvenile and continued his placement with the Turners.  The order also contained the following relevant decrees:

> 7. That at this time, it is not in the juvenile's best interest to have visitation with the Mother due to her current incarceration.  However, she may write letters and send them to the social worker to review and provide to the juvenile.
>
> 8. That . . . [Mother] may call between 1:00 p.m. – 3:00 p.m. twice a week. . . . [Mother] will be responsible for the cost of telephone calls.  Discussion must be age appropriate.  Phone contact must be supervised by the . . . [Turners] at a high level of supervision (eyes and ears on).  If child gets distressed or upset, the . . . [Turners] can discontinue the telephone calls.
>
> 9. That no discussions of the case should take place with . . . [Ryan].  That if the phone calls are negatively impacting the juvenile's mental health, the calls will no longer be permitted.

Thereafter, Mother was released from incarceration.  Meanwhile, Ryan continued to reside with the Turners.  Maria Turner stated Ryan was "doing better" at his placement, "learning what 'no' means[]"; however, "some days are more difficult

than others in regards to his defiance, but he is adjusting well . . . ."

On October 6, 2020, the trial court entered a review and permanency planning order. The trial court found that Ryan had been diagnosed with "ADHD, Generalized Anxiety Disorder, Oppositional Defiance Disorder and Post-Traumatic Stress Disorder." The trial court continued Ryan's placement with the Turners, ordered a primary plan of reunification with a secondary plan of guardianship, and granted Mother one hour of supervised visitation per week. The Palmers also were granted "unsupervised visitation, to include overnight, and the first and third weekend . . . of the month from 6:00 p.m. on Friday until 6:00 p.m. on Sundays."

On December 23, 2020, the trial court entered another review and permanency planning order that continued Ryan's placement with the Turners, granted the Palmers unsupervised visitations every first and third weekend of each month, and granted Mother one hour of supervised visitation per week. A few months later, DSS filed a report with the trial court stating that Ryan "appears well bonded to each of his parents and his placement providers." Ryan told DSS he enjoyed spending time with Elly Palmer and his parents but, at other times, also stated he does not want to go on the weekend visits to the Palmers' residence.

On June 28, 2021, the trial court entered a review and permanency planning order changing Ryan's primary plan to guardianship with a secondary plan of reunification. Another review hearing was scheduled for July 28, 2021 but continued

until August 11, 2021, and DSS and the guardian ad litem filed reports with the trial court on August 11, 2021. DSS reported Ryan stated he "wants to live with his dad or the . . . [Turners] and does not wish to live with . . . [Elly Palmer]." Ryan had, occasionally, refused to visit Mrs. Palmer's residence; however, a DSS social worker observed that Ryan seems to enjoy his visits when he did attend. Elly Palmer informed DSS that she was "on disability due to Clinical Depression" and "takes medication to assist with her depression but feels that she won't be sad anymore if . . . [Ryan] comes to live with her, as it will give her 'something to do.'" The DSS report further detailed various instances during which the Palmers and Turners experienced discord regarding Ryan's visitation, rearing, and transitioning between the Palmers' and Turners' residences. Notwithstanding, DSS and the guardian ad litem both recommended in their reports that the trial court appoint the Palmers and the Turners co-guardians of Ryan.

¶ 16   On August 11, 2021, the trial court held a review and permanency planning hearing. At the time of this hearing, Mother remained incarcerated with a projected release date of November 22, 2021. Ms. Lambert, the supervising social worker, testified at the hearing that there was a lot of animosity between the Palmers and Turners. She reported that the day prior, another social worker spoke with Elly Palmer to review DSS's recommendation of the Palmers' and Turners' co-guardship of Ryan. According to Ms. Lambert, when Elly Palmer heard this recommendation,

she became "very upset" and stated DSS "was being inappropriate, that this was the wrong statements." Elly Palmer further told the social worker "we'll just have to pray for them to die" so that she could acquire sole guardianship of Ryan. When the social worker told Elly Palmer these were inappropriate statements, she responded by laughing. Ms. Lambert explained, DSS was "very concerned that was, first of all, an inappropriate response. We were also concerned that maybe there was some emotional instability there, and then, finally, we were concerned that was a very strong indicator that they would not be able to work together as co-parents." Ms. Lambert reported DSS's recommendation changed from the Palmers and Turners having co-guardianship of Ryan to granting the Turners sole guardianship of Ryan. The guardian ad litem agreed with the change in recommendation.

¶ 17      The trial court entered a permanency planning order on September 17, 2021, decreeing,

> 1. That legal and physical guardianship, in accordance with N.C.G.S. § 7B-600, of . . . [Ryan] is granted to . . . [Maria and Jordan Turner].
>
> . . .
>
> 3. That . . . [Ryan] will primarily reside with the . . . [Turners] with visitation with the . . . [Palmers] every other weekend.
>
> . . .
>
> 20. That, at this time, due to . . . [Mother's] incarceration, visitation is contrary to the best interest, health and safety

of the juvenile. That . . . [Mother] may send cards, letters and other forms of written communication to the juvenile through Mr. . . . [Turner]. That . . . [Mother] is permitted to have a minimum of one telephone call a week with the juvenile that is to be highly supervised by his placement provider. That . . . [Mother] is responsible for cost associated with such communication. These calls shall be at reasonable times not past 9:00 p.m. or before 8:00 a.m. That the phone calls shall not unduly disrupt the juvenile's daily schedule. That all communication shall be age appropriate and the mother shall not make promises to the juvenile.

21. That during periods of their incarceration, it would not be in the best interest for the juvenile to participate in visitations with the parents due to the limitation of jail visits and current COVID concerns.

The same day, the trial court issued a guardianship short order granting guardianship of Ryan to the Turners. The guardianship short order, likewise, granted guardianship of Ryan to the Turners and allowed the Turners to "disclose this order to third parties in order to show their legal authority over the minor child or otherwise promote and protect the best interests of the minor child[] . . . ." Mother filed a timely notice of appeal from both of these orders.[4]

## II. Standard of Review

This Court reviews a permanency planning order to determine "whether there is competent evidence in the record to support the findings and the findings support

---

[4] Father did not appeal these orders.

the conclusions of law." *In re J.C.S.*, 164 N.C. App. 96, 106, 595 S.E.2d 155, 161 (2004) (citing *In re Eckard*, 148 N.C. App. 541, 544, 559 S.E.2d 233, 235 (2002)). The trial court's findings of fact are conclusive on appeal if they are supported by competent evidence. *In re Isenhour*, 101 N.C. App. 550, 553, 400 S.E.2d 71, 73 (1991); s*ee In re J.C.S.*, 164 N.C. App. at 106, 595 S.E.2d at 161; *In re Weiler*, 158 N.C. App. 473, 477, 581 S.E.2d 134, 137 (2003). Whether the trial court's findings of fact support its conclusions of law is reviewed *de novo*. *In re A.S.*, 275 N.C. App. 506, 509, 853 S.E.2d 908, 911 (2020).

¶ 19        "In choosing an appropriate permanent plan . . . the juvenile's best interests are paramount." *In re J.H.*, 244 N.C. App. 255, 269, 780 S.E.2d 228, 238 (2015); *see In re L.G.*, 274 N.C. App. 292, 297, 851 S.E.2d 681, 685 (2020) ("The purpose of a permanency planning hearing is to identify the best permanent plans to achieve a safe, permanent home for the juvenile consistent with the juvenile's best interest." (internal quotation marks omitted)). Although "[w]e review a trial court's determination as to the best interest of the child for an abuse of discretion[,]" *In re J.H.*, 244 N.C. App. at 269, 780 S.E.2d at 238 (quoting *In re D.S.A.*, 181 N.C. App. 715, 720, 641 S.E.2d 18, 22 (2007)), we have also held the best interest determination is a conclusion of law and thus subject to a *de novo* standard of review. *In re Helms*, 127 N.C. App. 505, 510-11, 491 S.E.2d 672, 675-76 (1997).

¶ 20        A trial court's order regarding visitation rights is reviewed for an abuse of

discretion. *In re C.M.*, 273 N.C. App. 427, 432, 848 S.E.2d 749, 753 (2020); *see In re I.K.*, 273 N.C. App. 37, 49, 848 S.E.2d 13, 23 (2020), *aff'd*, 377 N.C. 417, 2021-NCSC-60. "A trial court may be reversed for abuse of discretion only upon a showing that its actions are manifestly unsupported by reason or upon a showing that the trial court's decision was so arbitrary that it could not have been the result of a reasoned decision." *In re C.M.*, 273 N.C. App. at 432, 848 S.E.2d at 753 (cleaned up) (quoting *White v. White*, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985)).

### III.    Discussion

¶ 21        Mother raises several issues on appeal; each will be addressed in turn.

### A. Guardianship

¶ 22        Initially, Mother contends the trial court abused its discretion by determining it was in Ryan's best interest to appoint the Turners as his sole guardians. We disagree.

#### 1.  *Findings of Fact*

¶ 23        Mother first argues finding of fact number 106 is not supported by clear and convincing evidence. This finding states, Ms. Palmer "is not a safe and appropriate person to have fulltime care and/or decision-making responsibility over the juvenile." At the hearing, Ms. Lambert testified as to Ms. Palmer's reaction and comments after being notified of DSS's recommendation for co-guardianship. "She made statements . . . that the Department was being inappropriate, that this was the wrong

statements." Ms. Lambert further testified Ms. Palmer "also made statements that the . . . [Turners] were old and idiots, and . . . we'll just have to pray for them to die so that she can get . . . [Ryan]." Ms. Lambert explained DSS was "very concerned that was, first of all, an inappropriate response. We were also concerned that maybe there was some emotional instability there, and then, finally, we were concerned that that was a very strong indicator that they would not be able to work together as co-parents."

¶ 24    The trial court made the following unchallenged findings of fact relevant to finding of fact number 106:

> 48. . . . [Mrs. Turner] has shared that when . . . [Ryan] was around two years old, she was changing his diaper and Mrs. . . . [Palmer] was at her home and came over and placed her hand over his mouth and nose when he was wiggling around. There is no documentation of this concern being shared with law enforcement or CPS at the time of the incident.
>
> . . .
>
> 50. Recently[] . . . [Ryan] refused to go to Mrs. . . . [Palmer's] home and did not visit during the week of July 10. It was reported that during the recent attempted transition, . . . [Ryan] refused to go to Mrs. . . . [Palmer's] home and ran around the house, having the adults chase him. Both parties had varying views of the events that took place, but both maintain that . . . [Ryan] refused to go with the . . . [Palmers] and remained at the . . . [Turner's] home. Mrs. . . . [Palmer] stated that Mrs. . . . [Turner] yelled at her that . . . [Ryan] was not going with her. Mrs. . . . [Turner] reported that Mrs. . . . [Palmer] was pulling . . .

[Ryan] and trying to physically force him to go with her.

. . .

60. On July 22, 2021, SW observed . . . [Ryan's] transition back to the . . . [Turner's] home. When Mrs. . . . [Palmer] exited the car, Mrs. . . . [Palmer] stated to SW, "early morning for you"! [sic] SW replied, "I'm just working!" Mrs. . . . [Palmer] asked SW where she worked. This interaction was concerning as Mrs. . . . [Palmer] did not appear to recognize SW, although Mrs. . . . [Palmer] has met with SW multiple times and talks frequently on the phone to SW.

. . .

65. Mrs. . . . [Palmer] informed SW that she was on disability due to Clinical Depression, stemming from the loss of her two sons. Mrs. . . . [Palmer] stated that she takes medication to assist with her depression but feels that she won't be sad anymore if . . . [Ryan] comes to live with her, as it will give her "something to do." This is an inappropriate reason for a child to live with someone.

Because none of these findings were challenged by Mother, they are binding on appeal. *Isom v. Duncan*, 279 N.C. App. 171, 2021-NCCOA-453, ¶ 1. Therefore, based upon Ms. Lambert's testimony at the hearing, along with the additional findings of fact within the permanency planning order, we conclude competent evidence was presented to support finding of fact number 106.

¶ 25        To the extent Mother attempts to support her argument finding of fact number 106 is not supported by competent evidence by offering alternative evidence, "[f]acts found by the judge are binding upon this court if they are supported by any competent

evidence notwithstanding the fact that the appellant has offered evidence to the contrary." *Williams v. Williams*, 261 N.C. 48, 56, 134 S.E.2d 227, 233 (1964) (first citing *Mercer v. Mercer*, 253 N.C. 164, 116 S.E.2d 443 (1960); then citing *Briggs v. Briggs*, 234 N.C. 450, 67 S.E.2d 349 (1951)); *see Heatzig v. MacLean*, 191 N.C. App. 451, 454, 664 S.E.2d 347, 350 (2008). Thus, because we are holding today finding of fact number 106 is supported by competent evidence, we need not address Mother's alternative evidence.

### 2. *Conclusions of Law*

¶ 26 Because we hold finding of fact number 106 is supported by competent evidence, and Mother has not challenged any other finding of fact, we must determine whether the findings of fact support the trial court's conclusion of law. Specifically, Mother contends the trial court's conclusions of law numbers 20 and 24 are not supported by "clear, cogent, and convincing evidence." Conclusion of law number 20 provides, "[t]he current placement is appropriate and in the best interest of the juvenile." Similarly, conclusion of law number 24 states, "[t]hat this Order is in the best interest of the juvenile and consistent with the juvenile's health and safety."

¶ 27 Under N.C. Gen. Stat. § 7B-906.1,

> [t]he court may maintain the juvenile's placement under review or order a different placement, appoint a guardian of the person for the juvenile pursuant to G.S. 7B-600, or order any disposition authorized by G.S. 7B-903, including the authority to place the child in the custody of either

parent or any relative found by the court to be suitable and
found by the court to be in the *best interests of the juvenile*.

N.C. Gen. Stat. § 7B-906.1(i) (2021) (emphasis added). "[T]he fundamental principle

underlying North Carolina's approach to controversies involving child neglect and

custody, to wit, [is] that the best interest of the child is the polar star." *In re

Montgomery*, 311 N.C. 101, 109, 316 S.E.2d 246, 251 (1984).

¶ 28        As we stated *supra*, we review a permanency planning order's conclusions of

law to determine whether they are supported by its findings of fact. *In re J.T.S.*, 268

N.C. App. 61, 67, 834 S.E.2d 637, 642 (2019); *In re J.C.S.*, 164 N.C. App. at 106, 595

S.E.2d at 161. Any unchallenged finding of fact is presumed to be supported by

competent evidence and, thus, binding on appeal. *Koufman v. Koufman*, 330 N.C. 93,

97, 408 S.E.2d 729, 731 (1991). In addition to the findings of fact stated *supra*, the

trial court made the following findings of fact:

> 14. Freddie Omotosho[5] testified and verbally amended the
> recommendations in the written report to reflect a
> recommendation of guardianship to the . . . [Turners] only
> and visitation for the . . . [Palmers]. The change in the
> recommendation is based [sic] the fact that . . . [Ryan] has
> been with the . . . [Turners] for over one year, the . . .
> [Turners] were hesitant to take on permanent care of . . .
> [Ryan] due to their age but are now willing to provide
> longer term care and on Ms. . . . [Palmer's] inappropriate
> reaction to the recommendation that she work with the . . .
> [Turners], which makes it unlikely the . . . [Turners and

---

[5] Social Worker Freddie Omotosho was not present at the hearing. Ms. Lambert
supervises Mr. Omotosho and assisted with the preparation of DSS's report.

Palmers] would be able to work together for the best interest of the juvenile.

. . .

16. The Guardian *ad litem* testified and orally amended her recommendations to be in alignment with the revised, oral recommendations of the social worker.

. . .

33. . . . [Ryan] has continued to reside in the home of his paternal relatives, Mr. and Mrs. . . . [Turner], since coming into care in May 2020.

34. Apart from . . . [Ryan's] reluctant behavior in visiting Mrs. . . . [Palmer], the placement providers report no concerns in the placement home and SW has observed a loving and warm bond between . . . [Ryan] and the placement providers.

. . .

42. SW has been able to observe . . . [Ryan] with his parents, individually, as well as with the placement providers during the life of the case. . . . [Ryan] appears bonded to each of his parents and his placement providers.

43. . . . [Ryan] reports that he enjoys spending time with his parents and with the placement providers.

44. . . . [Ryan] stated that he wants to live with his dad or the . . . [Turners] and does not wish to live with Mrs. . . . [Palmer].

45. Previously, Mrs. . . . [Turner] has stated that given the ages of her and her husband that they cannot commit to permanent placement of . . . [Ryan]. More recently, the . . . [Turners] have stated that they are committed to providing permanence for . . . [Ryan] and wish to be considered as legal guardians.

. . .

52. During this . . . [Child and Family Team meeting], all parties were difficult to keep on track and often focused topics on their indifferences with one another. The facilitator had to redirect multiple times during the meeting.

. . .

58. Mrs. . . . [Palmer] has stated that sometimes . . . [Ryan] does refuse to come to her home but that after he is there, they always have a great time.

. . .

67. In the fall of 2020, Mrs. . . . [Palmer] was struggling with managing her depression but as of the spring of 2021, has since become more stable and able to manage her symptoms more effectively. The Department was able to review her records and confirm compliance.

. . .

98. The . . . [Turners] have demonstrated for over one year the ability to meet the needs of . . . [Ryan], financially, emotionally and otherwise.

99. The . . . [Turners] express an understanding of the role and responsibility of guardians and willingness to take on that role.

100. The . . . [Turners and Palmers] have attempted to work together but appear to have difficulty with interactions. This will make it difficult for them to work together to make decisions in the best interests of the juvenile.

. . .

104. When the Department informed Ms. . . . [Palmer]

about a change in recommendation to grant joint guardianship, the day prior to this hearing, Ms. . . . [Palmer] stated that she would just have to pray that the . . . [Turners] die. There have been some ongoing concerns about Ms. . . . [Palmer's] mental health. SW Omotosho testified, that her actions regarding the recommendation change appears to be a 'clear indicator' that she would not be able to co-parent with the . . . [Turners] successfully.

¶ 29     We conclude these findings of fact support conclusions of law numbers 20 and 24. Accordingly, we hold the trial court did not abuse its discretion by granting sole guardianship to the Turners and granting visitation only to the Palmers.

## B. Visitation

¶ 30     Mother next contends the trial court abused its discretion in denying her visitation with Ryan. We agree.

¶ 31     As a general rule, a parent has a "natural" and "legal" right to visit with his or her child and this should not be disturbed when awarding custody to another unless the parent's conduct is such that this right is forfeited, or the exercise of this right "would be detrimental to the best interest and welfare of the child." *In re Custody of Stancil*, 10 N.C. App. 545, 551, 179 S.E.2d 844, 849 (1971). Thus, when an order "removes custody of a juvenile from a parent, guardian, or custodian or that continues the juvenile's placement outside the home[, the order] shall provide for visitation that is in the *best interests of the juvenile* consistent with the juvenile's health and safety, including no visitation." N.C. Gen. Stat. § 7B-905.1(a) (2021) (emphasis added); *see*

*also Routten v. Routten*, 374 N.C. 571, 578, 843 S.E.2d 154, 159 (2020) ("[T]he trial court must apply the 'best interest of the child' standard to determine custody and visitation questions . . . ."), *cert. denied,* 141 S. Ct. 958, 208 L. Ed. 2d 495 (2020); *In re Custody of Stancil*, 10 N.C. App. at 552, 179 S.E.2d at 849.

¶ 32        "When the question of visitation rights of a parent arises, the court should determine from the evidence presented whether the parent by some conduct has forfeited the right or whether the exercise of the right would be detrimental to the best interest and welfare of the child." *In re Custody of Council*, 10 N.C. App. at 552, 179 S.E.2d at 849.  If the trial court does not find the parent's conduct has forfeited his or her visitation right, or that such right is detrimental to the child's welfare and best interest, it "should safeguard the parent's visitation rights by a provision in the order defining and establishing the time, place and conditions under which such visitation rights may be exercised." *Id.*

¶ 33        We pause to note Mother, in her brief, specifically challenges finding of fact number 19, stating "[t]he trial court found that it was contrary to Ryan's best interest and inconsistent with his health and safety to have visitation with Mother.  (R p 385, FOF #19).  The finding of fact is not supported by clear, cogent, and convincing evidence."  Our review of the record reveals finding of fact number 19 does not address

visitation as cited by Mother's brief.[6]  Rather, conclusion of law number 19 states, "[t]hat it is contrary to the best interest of the juvenile and inconsistent with the juvenile's health and safety to have visitation with the Respondent Mother."  Thus, we presume Mother intended to challenge conclusion of law number 19 and, as such, shall review whether the trial court's order findings of fact support its conclusion of law number 19.  *Accord State v. Holland*, 230 N.C. App. 337, 344, 749 S.E.2d 464, 468 (2013)

¶ 34        Here, the trial court found Mother does not remain available to the court, DSS, and guardian ad litem; is not actively participating in or cooperating with the plan, DSS, and guardian ad litem; and is "acting in a manner inconsistent with the health and safety of the juvenile."  It furthered that during the review period, the social worker "had very limited contact with . . . [Mother] due to her unknown whereabouts and incarceration[,]" and Mother was "sentenced to 9-20 months for . . . [a] probation revocation."  Based upon these findings of fact, we conclude conclusion of law number 19 is supported by the findings of fact.

¶ 35        Here, the trial court ordered the following visitation plan between Mother and Ryan:

---

[6] Finding of fact number 19 states, "[t]he court has inquired and no one presents information that the juvenile is a Mexican Minor or American Minor as defined in the Memorandum of Agreement between the Consulate general of Mexico in Raleigh and the Government of the State of North Carolina."

20. That, at this time, due to . . . [Mother's] incarceration, visitation is contrary to the best interest, health and safety of the juvenile. That . . . [Mother] may send cards, letters and other forms of written communication to the juvenile through Mrs. . . . [Turner]. That . . . [Mother] is permitted to have a minimum of one telephone call a week with the juvenile that is to be highly supervised by his placement provider. That . . . [Mother] is responsible for cost associated with such communication. These calls shall be at reasonable times not past 9:00 p.m. or before 8:00 a.m. That the phone calls shall not unduly disrupt the juvenile's daily schedule. That all communication shall be age appropriate and the mother shall not make promises to the juvenile.

21. That during periods of their incarceration, it would not be in the best interest for the juvenile to participate in visitations with the parents due to the limitation of jail visits and current COVID concerns.

Mother does not argue that her visitation should be not suspended while she is incarcerated; rather, she asserts the trial court made no findings regarding her visitation rights after she is released from prison. We agree.

Section 7B-905.1 provides the trial court "shall provide for visitation that is in the best interests of the juvenile . . . ." § 7B-905.1(a)(1). Our General Assembly's use of the language " 'shall' is a mandate to trial judges, and that failure to comply with the statutory mandate is reversible error." *In re Eades*, 143 N.C. App. 712, 713, 547 S.E.2d 146, 147 (2001) (citation omitted). Here, the trial court provided no guidance as to what visitation rights, if any, Mother has with Ryan upon her release from prison.

Indeed, the trial court was aware of Mother's pending release as it found, Mother "was transferred to the NC Women's Correctional Institution and anticipated to be released November 24, 2021." The permanency planning order was entered approximately two months prior to November 24, 2021. Because Mother's release from prison was imminent, the trial court should have provided for a visitation plan after her release that was in Ryan's best interest. We are mindful of that fact that Mother's projected release date will have long passed by the date of this opinion. Therefore, we remand to the trial court for further findings of fact regarding visitation between Mother and Ryan and an appropriate visitation schedule. In making the determination regarding an appropriate visitation schedule, the trial court may conduct a new hearing in order to examine the current circumstances of Ryan and Mother to determine what schedule is in the best interests of Ryan.

## IV. Conclusion

For the foregoing reasons, we affirm the orders of the trial court granting guardianship to the Turners. However, we remand the September 17, 2021 permanency planning order to the trial court for further findings of fact and a determination of an appropriate visitation schedule between Mother and Ryan. It is so ordered.

AFFIRMED IN PART AND REMANDED IN PART.

Judges INMAN and ARROWOOD concur.